James **DIMARZO** et al.,
Plaintiffs-Appellees,

v.

Robert E. **CAHILL** et al.,
Defendants-Appellees,

Frank A. Hall, Defendant-Appellant.

James **DIMARZO** et al.,
Plaintiffs-Appellees,

v.

Robert E. **CAHILL**, Defendant-Appellant.

**Nos. 77–1416 and 77–1417.**

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1978.

Decided May 2, 1978.

As Amended May 19, 1978.

Levin H. Campbell, Circuit Judge, concurred with an opinion.

Robert H. Claridge, Counsel, Dept. of Correction, Boston, Mass., and John N. Nestor, Lynn, Mass., with whom Lee Carl Bromberg, Special Asst. Atty. Gen., Boston,

Mass., was on brief, for defendant-appellant.

Alvin J. Bronstein, Boston, Mass., with whom Susan E. T. Studlien and Ernest Winsor, Boston, Mass., were on brief, for plaintiffs-appellees.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Commissioner of Correction Hall and Essex County Sheriff Cahill appeal from an order by the district court mandating certain changes in the Essex County Jail and House of Correction (hereafter "Essex"). Sheriff Cahill filed no brief in support of his appeal; he was represented at oral argument where his counsel stated that the sheriff's position was ministerial only and that he has tried to comply with the court order to the extent within his power. The Essex County Commissioners, who have not appealed from the district court order, control the purse strings, not the sheriff. The Commissioners, we were informed at oral argument, have appropriated funds to effectuate the changes for which they are responsible. Our opinion is addressed primarily to points raised in defendant Hall's brief.

Essex, constructed in 1815 with an addition in 1884, houses approximately eighty-five prisoners in the House of Correction and approximately twenty-five pretrial detainees in the Jail. Plaintiffs-inmates brought suit under 42 U.S.C. § 1983 alleging numerous unconstitutional conditions and practices.

The district court found conditions at Essex to fall below constitutional minimum requirements. After viewing Essex, he ordered specific improvements relating to fire prevention and protection, health, recreation, and sanitation.

The court found the most pressing problem to be the fire hazard. The structure is divided into four tiers; the only exits from the cells are through the central stairwell at one end of the building and from the floor level into the exercise yard. The floors of the catwalks are tongue and groove pine, covered with several layers of old paint and, in some cases, flammable floor covering. The cells must be unlocked individually. The two fire hoses on the stairwell would be totally ineffectual if there were either fire or extensive smoke in the stairwell. The cells are equipped with mattresses which are composed either of flammable ticking or of a foam which exudes highly toxic gas when ignited.

There is only one flush toilet for the approximately 130 inmates. No plumbing at all exists in the cells. Inmates are provided a plastic pail for excrement, a water pitcher and a plastic basin. Absence of privacy when one is engaged in personal functions is only one of the results of this system.

There are only two sets of shower stalls, each with three shower heads. The court found that existing facilities would permit the installation of at least three more enclosed flush toilets and sinks. This would help alleviate the difficulties presented by the present plumbing arrangements. The trial judge found that inmates were not always issued the required pitcher, basin, towel, sheets, and blankets upon admission.

Kitchen screens were found to be filthy and storage of food did not always comport with health requirements concerning separation of food and cleaning materials. Many of the windows in the cell area were without glass, being covered instead with dirty screens or dirty plastic sheeting which was frequently torn. Such conditions drastically reduce the amount of sunshine in the cells.

Prisoners are allotted fifteen hours per day out-of-cell time; pretrial detainees are permitted ten and one-half hours per day for three days a week, seven and one-half hours for the alternating three days, and fifteen hours on Sunday.

The district court directed that certain changes be implemented to bring Essex within constitutional bounds.

## I.

Defendant Hall moves us to strike him as a party defendant because, he claims, he cannot be held responsible for denying plaintiffs their constitutional rights. The Commissioner construes too narrowly his statutory duties. *See Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196, 1199 (1st Cir.), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974). Under Massachusetts law, the Commissioner of Correction has supervisory responsibility for all state correctional facilities, Mass.Gen. Laws ch. 124 § 1(a), and is charged with promulgating minimum standards for the care and custody of persons committed to those facilities. Mass.Gen.Laws ch. 127 § 1A. Should he find any facility in violation of those minimum standards, he is instructed to seek compliance by resort to the specific statutory enforcement procedures of Mass.Gen.Laws ch. 127 § 1B (set out in the margin below[1]). Mass.Gen.Laws ch. 124 § 1(d). As Commissioner, he has an express duty to establish rules and regulations relating to sanitation, safety, recreation, classification, care and custody of the persons committed to the correctional facilities. Mass.Gen.Laws ch. 124 § 1(q). Plaintiffs have alleged that, by failing to promulgate and enforce proper statutory standards, defendant Hall caused them to suffer the unconstitutional conditions of which they complain.

Defendant Hall argues, relying on *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), that there is an insufficient causal link between the constitutional violations and any action or inaction on his part. He argues that his mandate is only to promulgate standards and inspect the facility and that his failure to do so does not have constitutional implications. He cannot so easily elude his mandate. Surely, if the Commissioner had promulgated standards which fell below a constitutionally permissible level, there can be no serious dispute but that this would constitute the establishment of a policy or practice open to attack by plaintiffs. *Cf. Rizzo v. Goode, supra,* 423 U.S. at 371, 96 S.Ct. 598. Conversely, there would exist no constitutional grievances if the Commissioner were in conformity with his statutory duties, *viz.,* to promulgate and enforce minimum (which of necessity means, at the very least, constitutional) standards. We are faced with a situation where the Commissioner of Correction has statutory responsibility over precisely the conditions giving rise to the violations. We are not confronted with sporadic incidents, over which the Commissioner might properly claim to have no knowledge or control.[2]

---

1. Mass.Gen.Laws ch. 127 § 1B. *Inspection of county correctional facilities; compliance with minimum standards; report; notice of violations; enforcement procedure*

    At least once each six months the commissioner or his delegate shall inspect each county correctional facility to determine compliance with minimum standards. . .

    If, in the opinion of the commissioner, any county correctional facility does not comply with the standards established by him for county correctional facilities, the commissioner shall give notice of the alleged violation to the sheriff and the county commissioners of the county in which such facility is located . . . . Said notice shall specify the particular standards that in the commissioner's opinion have not been met by such facility. The officials so notified shall have the right to be heard by the commissioner with regard to the alleged violation and shall have a reasonable period of time to remedy any such violation. If, in the opinion of the commissioner, the facility has not been brought into compliance with the aforesaid standards within a reasonable period of time from the date when notice of their violation is given, the commissioner may petition the Superior Court in equity in the county in which such facility is located for an order to close the facility or for other appropriate relief. The Superior Court shall have jurisdiction to enter such an order.

2. Other courts which have found supervisory personnel in positions such as defendant Hall's proper party defendants, *post Rizzo v. Goode* include: *Miller v. Carson,* 563 F.2d 757 (5th Cir. 1977); *Welsch v. Likins,* 550 F.2d 1122, 1131 (8th Cir. 1977); *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1065 (7th Cir. 1976), *modified on other grounds,* 548 F.2d 715 (7th Cir. 1977); *Sims v. Adams,* 537 F.2d 829, 831–833 (5th Cir. 1976); *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 150–155 (D.Pa.1977). *Cf. United States ex rel. Wolfish et al. v. Levi,* Nos. 77–2035 and 77–2135, 573 F.2d 118 (2d Cir. Jan. 24, 1978).

Rather, we are dealing with the pervasive failure of responsible authorities to maintain Essex in conformity with constitutional requisites. The causal nexus between Hall's acts or failure to act and the constitutional infirmities is clear.[3]

■ A natural consequence of Hall's failure to comply with his statutory duties to promulgate and enforce minimum standards is that conditions would fall below a constitutionally allowable limit. We emphasize what is implicit in the foregoing analysis, i. e., that Hall is a proper defendant because of his *own* statutory duty and subsequent failure to act (and the consequent constitutional injury) and not on the basis of the acts of others. We thus do not face the issue of whether it is proper to predicate liability under section 1983 on the basis of respondeat superior. *Cf. Kostka v. Hogg,* 560 F.2d 37, 40 n. 1 (1st Cir. 1977).

## II.

Defendant Hall next urges us to hold that there is no live case or controversy because plaintiffs lack standing to sue. The basis for this assertion lies in defendant's view of the nature of the injury which plaintiffs must sustain for their allegations to rise to the status of an actual case or controversy. The requisites for standing were capsulized in *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). A party must allege "a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . ." *See also Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37–39, 96 S.Ct.

1917, 48 L.Ed.2d 450 (1976); *Buckley v. Valeo,* 424 U.S. 1, 11–12, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Rizzo v. Goode, supra; Warth v. Seldin,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ It cannot be doubted that features relating to general health and sanitation within Essex are of prime interest to inmates incarcerated there. Nor can there be any serious dispute that plaintiffs inmates have a personal stake in the fire-worthiness of the structure in which they are housed. Defendant Hall inaptly construes the requirement of injury as requiring proof that the inmates inevitably will suffer physical injury or death from fire before they have standing to challenge the hazardous fire conditions which the district court found existing at Essex. We find this proposition to fall far below contemporary expectations of constitutionally-mandated humane treatment. One need not wait for the conflagration before concluding that a real and present threat exists.[4]

## III.

■ We next examine whether the district court exceeded the scope of its discretion by ordering the closing of Essex if certain mandated corrections are not implemented. Federal courts have long exercised equity powers and in the key case of *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Court highlighted the authority federal courts have when confronted with constitutional abridgements. "Once a right and a violation have been

---

**3.** As Mr. Justice Douglas pointed out after a thorough historical exegesis, the Civil Rights Acts of 1871 were intended to safeguard constitutional rights which state authorities might deny by neglecting to enforce state statutes as well as by more affirmative action. *Monroe v. Pape,* 365 U.S. 167, 180, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *See also Developments in the Law—Section 1983 and Federalism,* 90 Harv.L. Rev. 1133, 1153 (1977). Failure to act where there is a duty to act can give rise to an actionable claim under section 1983.

**4.** We note that evidence submitted to the district court showed that there had been a seri-

ous fire at Essex in February, 1975, which destroyed four cells, the floor, and electrical wiring. There was also affidavit testimony that inmates set small fires in the cells and that, at least upon one occasion, an inmate was so overcome by heat that he could not get by the fire to reach the escape door. He was trapped in the rear of the cell block until the fire was put out. As we noted, *supra* at 16, the district judge personally inspected Essex and concluded that it presented a serious fire hazard. Defendants have given us no basis for finding the court's conclusions to be clearly erroneous.

shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 15, 91 S.Ct. at 1276. The district court properly recognized the delicate balance which must be maintained on two levels: as between the judiciary on the one hand and the legislative and executive on the other, and the special delicacy required in a federal system such as ours. We do not think that the court exceeded its equitable powers.

The changes ordered by the court were narrowly directed to the prime areas of concern. The court ordered specific fire safety measures;[5] glazing of windows with clear glass in lieu of the previous (frequently torn) opaque plastic covers; screens on windows in the kitchen; proper cleaning of food storage areas; enclosed toilet and sink for use by the inmates at the site of existing water and sewer lines. The court also ordered an increase in the Jail staff for the dual purpose of providing adequate fire prevention protection and of permitting pretrial detainees out-of-cell time substantially equivalent to that permitted inmates in the House of Correction (persons already convicted of a crime).

In reviewing the district court's order, we note several points. First, we understand from oral argument that those portions of the order which called for implementation by October 31, 1977, and December 31, 1977, have been effectuated. The only parts of the order outstanding require a second egress to be built, wooden stairs in the cell area to be replaced with noncombustible material, and installation of an electronic system for opening cell doors from a central location in case of fire. We leave undisturbed those parts of the order already implemented. Those which yet remain to be carried out are affirmed. This is not a case where the district court has substituted its own notions of what might be desirable in a corrections setting for that of the prison authorities. *Cf. Nadeau v. Helgemoe,* 561 F.2d 411, 417 (1st Cir. 1977). The court wisely did not unnecessarily intrude into provinces best left to administrative expertise. *See e. g., Jones v. N. C. Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *United States ex rel. Wolfish et al. v. Levi,* Nos. 77–2035 and 77–2135, 573 F.2d 118 (2d Cir. Jan. 24, 1978); *Newman v. State of Ala.,* 559 F.2d 283, 287 (5th Cir. 1977).

Faced with unconstitutional conditions, the court ordered that the facility be brought within constitutional parameters. The remedy does not exceed the constitutional violation. *See Milliken v. Bradley,* 418 U.S. 717, 744–745, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*). The mandated changes are modest in nature, fair to the inmates, and not oppressive for the corrections authorities. We conclude that, on the facts of this case, the order of the district court is "reasonable, feasible and workable." *Swann v. Board of Education, supra,* 402 U.S. at 31, 91 S.Ct. 1267.

We do not understand defendant Hall's complaint to lie with the specifically mandated changes, but rather with the trump card held by the district court, namely, the threat of ordering Essex closed if the changes are not made. We find neither error nor abuse of discretion in the court's action. A district court can order changes which will force the state to expend funds. *Milliken v. Bradley,* 433 U.S. 267, 288–291,

---

5. We take this occasion to express our concern at counsel's inaccurate characterization of a case relied on in the brief. Specifically, we refer to defendant-appellant Hall's brief at 24, where counsel states that, although Judge Garrity found a fire hazard at the Charles Street Jail, *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), similar to that found by Judge Skinner at Essex, Judge Garrity "refrained from ordering any changes." Counsel then states that this judicial "restraint" exercised by Judge Garrity should properly have been exercised by Judge Skinner in the instant case. As counsel unmistakably knows, Judge Garrity ordered the Charles Street Jail closed because of the unconstitutional conditions he found there. To assert, as counsel does in his brief, that Judge Garrity found a fire hazard and did nothing about it, substantially understates Judge Garrity's remedial concerns.

97 S.Ct. 2749 (1977) (*Milliken II*); *Edelman v. Jordan,* 415 U.S. 651, 667–668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Martinez Rodriguez v. Jimenez,* 537 F.2d 1 (1st Cir. 1976). If the legislature should balk at allocating funds for court ordered changes, an appropriate remedy for a court to choose, at least conflicting with principles of federalism and with the separation of powers, is to order the facility closed. *See Rhem v. Malcolm,* 507 F.2d 333, 339 (2d Cir. 1974); *Inmates of the Suffolk County Jail v. Kearney,* 573 F.2d 98 (1st Cir., March 17, 1978). As there has been admirable compliance with the district court order thus far, we are not confronted by an actual controversy concerning the closure order. Accordingly, we forebear consideration of what specific conditions might give rise to such an order. U.S.Const. art. III, § 2, cl. 1.

We briefly consider defendant Hall's assertion that the court should not have kept the closure of Essex as a possible remedy since a number of the inmates had indicated in a letter written to a local newspaper that they preferred Essex to a more distant facility. The fact that some inmates might prefer unconstitutional conditions in no manner lessens the district court's responsibility when confronted with a situation which offends the Constitution. *Swann v. Board of Education, supra,* 402 U.S. at 16, 91 S.Ct. 1267.

### IV.

Finally, defendant argues that the district court should not have ordered that additional staff be hired. In issuing its order, the court stated that the additional staff could be used to increase fire protection and to afford more out-of-cell time to the detainees.

As noted in *Feeley v. Sampson,* 570 F.2d 364, 369 (1st Cir. 1978), many courts have held that pretrial detainees are to be confined only to the degree necessary to guarantee their presence at trial. *See Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976); *Rhem v. Malcolm, supra,* 507 F.2d at 336; *Inmates of the Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 685–688 (D.Mass.

1973). However, the district court's order in the present case may be affirmed even under less rigorous standards. "Restrictions upon detainees that serve no proper purpose, but merely reflect the lack of imagination or energy of local officials, are properly the subject of judicial correction." *Feeley v. Sampson, supra,* at 371. Here, the sheriff and jail officials indicated that they would be willing to grant more out-of-cell time to detainees presenting no special security problems if provided with additional supervisory staff. The court left it to the discretion of the sheriff how he might use these resources to arrange for additional out-of-cell time. Given the flexibility of these arrangements, we cannot say that the district court's requirement was, under all the circumstances, unreasonable. Nor can we find in the record that the state has articulated any constitutionally sufficient reason for withholding out-of-cell privileges to pretrial detainees substantially equivalent to those provided the convicts at Essex. Therefore, we find no error in the court's order to hire additional staff for the dual purpose to help alleviate the fire hazard at Essex and to maximize out-of-cell time for pretrial detainees.

*The order of the district court is affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

The district court's resolution recognizes that jail authorities are constitutionally bound to maintain a safe and humane environment, but at the same time reflects a proper sensitivity to the narrow role which a court should play in these matters. While I thus concur with my brethren in affirming the decision below, I wish to make it clear that I would not agree that merely because sentenced prisoners are given a certain amount of out-of-cell time, detainees are constitutionally required to receive the same. A mechanistic approach to constitutional analysis seems to me inappropriate. *See generally Feeley v. Sampson,* 570 F.2d 364 (1st Cir. 1978). There are plausible reasons why a short-term detainee might reasonably be subjected to greater limitations than those imposed upon a regular

inmate. Some regular inmates, like those serving short sentences for misdemeanors, are not security risks. Detainees, on the other hand, are likely to be recidivists or persons charged with serious crimes. Furthermore, long-term sentenced prisoners are more obviously entitled to opportunities for exercise and recreation than persons being held for a few days or weeks. Thus I think the kind of simple comparison my brothers would make, while reasonable enough on occasion, is no substitute for a more comprehensive analysis.

In this case, however, the authorities principally concerned—the county commissioners and sheriff—have not seriously objected on security grounds, or even on grounds of expense, to the district court's order in regard to out-of-cell time, and I think it can be fairly assumed that the district court's determination rests on a reasonable and practical view of what can and should be done, in keeping with principles set forth in *Feeley,* rather than upon a mere mechanical comparison.